ROBERT J. McKEAGUE AND SIBYL DAVIS, ADMINISTRATRIX WITH THE WILL ANNEXED OF THE ESTATE OF MABEL M. McKEAGUE, DECEASED *v.* MARY L. FREITAS.

NO. 2895.

ARGUED APRIL 2, 1953.                    DECIDED MAY 8, 1953.

TOWSE, C. J., LE BARON AND STAINBACK, JJ.

OPINION OF THE COURT BY STAINBACK, J.

Mary L. Freitas, defendant and plaintiff in error, was the lessee from the Bishop Estate of certain residential property at Kahala in the city of Honolulu. One Thomas McVeagh held a sublease on a portion of this land; this sublease expressly provided that it could not be assigned without the consent of Mary Freitas.

In 1943 Robert J. McKeague acquired the sublease from Thomas McVeagh by purchase for a sum of $8,500, the Bishop Trust Company, Limited, acting as broker. At that time Mrs. Freitas was not in the Territory of Hawaii and McKeague did not obtain her consent to the assignment. McKeague made substantial improvements on the premises and tender of the rental was made the entire time of McKeague's occupancy until the expiration of the ground lease and the sublease on December 1, 1947, but Mrs. Freitas refused to receive the same or to recognize the validity of the assignment by McVeagh.

At the expiration of the lease, December 1, 1947, McKeague in order to protect his investment sought a new lease direct from the trustees of the Bishop Estate covering the portion of the land previously covered by the sublease. At the same time Mrs. Freitas sought the aid of attorneys and through them applied for a new lease which would include the property occupied by McKeague. The trustees of the Bishop Estate refused to issue, or agree to issue, any lease pending an adjustment of the differences between McKeague and Mrs. Freitas.

In company with her son George, Mrs. Freitas consulted with her attorney and possibly at other times alone,

as did George Freitas, her son, in regard to obtaining a renewal of the Bishop Estate lease.

Thereafter, the attorney prepared for Mrs. Freitas a letter addressed to Mr. and Mrs. McKeague as follows:

"January 23, 1948

"Mr. and Mrs. Robert J. McKeague
"1425 Kinau Street
"Honolulu, T. H.
"Dear Mr. and Mrs. McKeague:

"It is my understanding that you will release your rights in the property located at 4709 Kahala Avenue subject to the following terms:

"1. I will forgive and release you from payment of any rents, taxes or other charges to me from you up to the date of March 15, 1948, or any interest which may have occurred thereon. In addition I will pay you the sum of $1,000 payable upon your vacating the premises.

"2. In consideration of the above you will agree to remove from the premises at 4709 Kahala Avenue on or before March 15, 1948, and will release any and all interest you may have in said property and will agree to cease any further efforts to obtain a lease on your own behalf and in your own name from the Bishop Estate, further agreeing if necessary, to urge the Trustees of said Estate to grant me renewal of my lease on the said property.

"If this is agreeable to you would you please sign this letter in the space provided below.

"It is understood that this is a compromise agreement and does not constitute an admission by either of us as to the validity of any claims of the other.

-----------------------------------------------------------
"Mary Freitas

"ACCEPTED BY:

"_____

"_____"

This letter was not signed by Mary Freitas and she did not see or read the same before it was sent out but her name was placed thereon by her attorney; it was signed by both of the McKeagues and returned to Mrs. Freitas' attorney.

Shortly thereafter the original document was given to Mrs. Freitas and a copy was furnished to the Bishop Estate as evidence of the settlement of the dispute. Neither Mrs. Freitas nor anyone on her behalf had any communication with her attorney or with McKeague with reference to the agreement after its receipt by her and prior to March 16, 1948, the date upon which McKeague, having vacated the premises in accordance with this purported agreement, visited the office of Mrs. Freitas' attorney to report his compliance with the terms of the purported agreement and to inquire about the payment of the $1,000 provided for therein. Her attorney, in the presence of McKeague, telephoned Mrs. Freitas and advised her of McKeague's vacating of the premises and of his request for payment, to which Mrs. Freitas replied that she had not yet received the renewal of the lease and stated that when she got the new lease she would pay. Thereupon the attorney advised McKeague to contact officials of the Bishop Estate and urge them to grant a new lease to Mrs. Freitas. This was done by McKeague, and Mary Freitas was advised on April 19, 1948, that a new lease had been offered to her by the Bishop Estate.

In the meantime, after Mrs. Freitas had received notification that a new lease was offered her, Mrs. Freitas notified her attorney she would not be bound by the terms of the letter written by him. This repudiation of the pur-

ported agreement occurred about April 30 when Mc-Keague, upon hearing of the offer of the new lease, again went to the office of Mrs. Freitas' attorney to inquire about payment.

Thereupon suit was filed by McKeague against Mrs. Freitas for breach of the alleged compromise agreement.

While there are various assignments of error, the case reduces itself to whether Mrs. Freitas entered into this contract either by prior authorization of her attorney or by ratification of his act.

There is a dispute as to whether the attorney had authority initially to enter into the agreement with Mc-Keague. The attorney claims that he did have such authority, at least thought that he had; this "impression" of the attorney that he had such authority probably was based to a large extent upon the acts of George, a son of Mrs. Freitas. However, the testimony of both George and Mrs. Freitas was to the effect that he did not represent her and had no authority to bind her to a compromise agreement.

The first point argued is that an attorney, by virtue of his general retainer, has no implied powers to compromise and settle his client's claim or cause of action. This point is admitted by the plaintiff, who argues that this has no application to the present case. It is needless to cite extensive authorities that an attorny has no power by virtue of his general retainer to compromise his client's cause of action. (5 Am. Jur., Attorneys At Law, § 70, p. 300; § 98, p. 318; 66 A. L. R. 102, and annotation; *Russell* v. *Makainai,* 31 Haw. 599.) The annotation in 66 A. L. R. 102, *supra,* states: "The almost unanimous rule, laid down by the courts of the United States, both Federal and state, is that an attorney at law has no power, by virtue of his general retainer, to compromise his client's cause of ac-

tion; but that precedent special authority or subsequent ratification is necessary to make such a compromise valid and binding on the client."

Thus, a person dealing with an attorney, as dealing with any agent, must ascertain whether the agent has authority to do the purported act and assumes the risk if in fact the agent has no such authority. However, the authority of an attorney need not be given in any particular form or conferred in any particular manner (except when compromising pending litigation) and, like any other fact, the fact of agency or the extent of an agent's authority may be created by implication; further, the unauthorized act of an agent, if ratified, is as binding upon the principal as an original express grant of authority. The question of ratification will be discussed hereinafter.

The next contention by plaintiff in error is that the attorney at law who had been the attorney for Mrs. Freitas in trying to obtain a new lease from the Bishop Estate and settle her dispute with McKeague should not have been permitted to testify concerning instructions given him with regard to the settlement of this claim, nor should he have been allowed to testify relative to contacting various officials of the Bishop Estate relative to granting a new lease and information he had obtained from such parties.

Obviously, the conversation of third parties does not come within the confidential rule of attorney and client as this privilege relates to communications between attorney and client. (58 Am. Jur., Witnesses, § 460, p. 259.)

Also, it was alleged to be error to permit this attorney to testify as to a certain conversation he had with his client bearing upon his authority when such conversation was over the telephone and in the presence of Mr. McKeague. This conversation with Mrs. Freitas was intend-

ed to be communicated to Mr. McKeague from its very nature and such communications are not privileged. (58 Am. Jur., Witnesses, § 490, p. 274.)

When an attorney has been authorized by his client to make a settlement he may disclose such fact under certain conditions. In the case of *Fleschler* v. *Strauss,* 60 P. (2d) 193 (D. C. App. Calif. 1936), an attorney was allowed to testify that after receiving an offer of compromise from the plaintiff he communicated that offer to the defendant and received instructions from the defendant to accept the offer, which he did on behalf of the defendant. It was held that such communications between the defendant and his attorney were not confidential. The court quoted with approval from the case of *Koeber* v. *Somers,* 108 Wis. 497, 84 N. W. 991, 993, 52 L. R. A. 512, 514, 515, as follows: "The proposition advanced by respondent * * * that one, after fully authorizing his attorney, as his agent, to enter into contract with a third party, and after such authority has been executed and relied on, may effectively nullify his own and his duly-authorized agent's act by closing the attorney's mouth as to the giving of such authority, is most startling. A perilous facility of fraud and wrong, both upon the attorney and the third party, would result. The attorney who, on his client's authority, contracts in his behalf, pledges his reputation and integrity that he binds his client. The third party may well rely on the assurance of a reputable lawyer that he has authority in fact, though such assurance be given only by implication from the doing of the act itself. It is with gratification, therefore, that we find overwhelming weight of authority against the position assumed by the court below, both in states where the privilege protecting communications with attorneys is still regulated by the common law and in those where it is controlled by statute, as in Wisconsin."

It is alleged prejudicial error was committed to allow the introduction into evidence of plaintiff's exhibit number 3, the letter purporting to constitute a contract between Mrs. Freitas and the McKeagues. There was a dispute as to whether the attorney had authority to enter into this agreement with McKeague, the attorney claiming that he did have authority and Mrs. Freitas claiming that he did not. This was a question of fact to be resolved by the jury under all of the circumstances, as was the question of ratification. The dispute between the attorney and his client did not go to the admissibility of the document but only to its weight. The proper foundation having been laid for the admission of the document, that is the identity and authenticity of the document by direct or circumstantial evidence, the fact that the written contract which was sought to be introduced in evidence is not fully executed by one of the parties thereto, or is invalid or ineffectual as a contract, does not render it inadmissible. (2 Jones, *Evidence,* 4th ed., § 500, p. 964.)

The document must be considered not only in the light of whether there was original authority but whether there was a ratification of the acts of the attorney by Mrs. Freitas when she accepted all the benefits of the agreement and did not repudiate the contract until after she had obtained the full benefits therefrom. The evidence is undisputed that Mrs. Freitas received the agreement promptly after its execution by the McKeagues, that she had knowledge of its terms and did not attempt to repudiate the same when she communicated with her attorney by telephone when Mr. McKeague was waiting in the attorney's office, but on the contrary it affirmatively appears she indicated her consent and confirmation of the agreement but would not pay the amount agreed upon until she had obtained a new lease from the Bishop Estate. It

is also undisputed that after the fact was communicated to McKeague, he was urged to assist Mrs. Freitas in obtaining a new lease from the Bishop Estate, which he did, and she was successful in securing a new lease. These facts would justify the jury finding for the plaintiffs because having accepted the benefits she thereby ratified the agreement, and it is immaterial whether the attorney had original authority or not. The jury was properly instructed in this regard. (1 Mechem, *Agency*, 2d ed., §§ 434, 435, p. 316.)

"There is * * * no more certain and satisfactory a method of manifesting approval of an act than by voluntarily and knowingly taking the benefits which flow from its performance; and it is a general rule, of constant application in the law of agency, that he who, voluntarily and with knowledge of the facts, accepts the benefit of an act purporting to have been done on his account, by his agent, thereby ratifies it and makes it his own as though he had authorized it in the beginning." (1 Mechem, *Agency*, 2d ed., § 434, p. 316, *supra*.)

The principal must take the burdens as well as the benefits resulting from the act of an agent.

"* * * One, therefore, who voluntarily accepts the whole or any part of the proceeds of an act done by one assuming, though without authority, to be his agent, must ordinarily be deemed to ratify the act and take it as his own with all its burdens as well as all its benefits. He may not ordinarily take the benefits and reject the burdens, but must either accept them or reject them as a whole." (1 Mechem, *Agency*, 2d ed., § 435, p. 316, *supra*.)

There are other allegations of error such as whether it was prejudicial error for counsel to ask Mrs. Freitas' attorney whether she would waive her privilege with regard to the testimony of her former attorney and the al-

leged statements of George Freitas which obviously could not prove any authority in George to act for his mother. If errors, they are harmless and need not be considered inasmuch as there is no dispute that Mrs. Freitas, knowing of the terms of the contract, accepted the benefits and did not attempt to repudiate it until she had obtained all the benefits of the purported contract entered into by her attorney. These undisputed facts of ratification would have justified a directed verdict for plaintiffs.

Affirmed.

*K. E. Young* (also on the briefs) for plaintiff in error.

*W. L. Fleming* (*Smith, Wild, Beebe & Cades* with him on the brief) for defendants in error.

